GEORGE TURNER *versus* THE PROTECTION INSURANCE COMPANY.

If the master of a vessel, which has been insured, in departing from the usual course of the voyage from necessity, acts *bona fide* and according to his best judgment, and has no other view but to conduct the vessel by the safest and shortest course to her port of destination, what he does is within the spirit of the contract of assurance, and the voyage will be protected by it.

The primary purpose of the owner of a vessel and of the cargo, and of others interested, is to have the voyage completed without unnecessary delay. This is known to the insurer when he takes the risk. And if the vessel suffer such injury during the voyage, that she cannot safely proceed to her port of discharge without repair, the master is not compelled to proceed directly to the nearest port, geographically, to make the repair, in order that the voyage should be protected by the policy. So long as she can be expected by an intelligent and faithful master to pursue her voyage in safety, she will be entitled so to do.

When a vessel has sustained damage, the interest of the insurer is not the controlling consideration, that should influence the master to depart from the course of his voyage. That consideration is the safety of life; and next to that is the preservation of the property entrusted to his care. And the pursuit and accomplishment of the voyage can be forsaken or delayed only so far, as it may become necessary for the security of life and property.

When the safety of life and property requires an instant and entire departure from the course of the contemplated voyage, it is the duty of the master to seek the nearest land which he can hope to reach, if the peril be so great as to outweigh all other considerations; and he should proceed directly upon his new course without delay or deviation, unless prevented by some unforeseen obstacle. But if the state of the weather be such that, in the judgment of the master, it would be more safe to seek another port, it would then become his duty to attempt to reach it.

ASSUMPSIT upon a policy of insurance entered into by the defendants on June 26, 1844, by which the plaintiff was caused to be assured the sum of five thousand dollars on freight on board the barque Isadore, at and from Havana to St. Petersburg.

The general issue was pleaded, with a brief statement wherein the defendants alleged: — First. That at the inception of said voyage, the said barque was unsound, leaky, badly found, and unseaworthy. Second. That before and at the time of the loss aforesaid, the said barque had deviated and departed from the true and proper course of the voyage insured against,

in a manner particularly pointed out. Third. That the barque was lost from the ignorance and want of nautical skill of the master and mariners of said barque, and not from any of the perils or dangers insured against in said policy.

The verdict was for the plaintiff, and the defendants filed a motion to set it aside, and grant a new trial, because it was against the evidence in the case, and without evidence. The whole evidence introduced at the trial before WHITMAN, C. J. is given in the report. The facts will be sufficiently understood, from the statement of them in the opinion of the Court.

Upon the evidence, the jury were instructed, that every vessel put to sea, and insured, to entitle the insured to recover, must be seaworthy; must be completely fitted, equipt and manned for the voyage; that a vessel might be seaworthy for a voyage of one description, when she would not be so for another; and to determine, therefore, whether a vessel be seaworthy, or not, the particular employment to which she might be destined must be looked to; that some vessels were fit to carry cargoes of light, bulky articles, which would not be fit to carry cargoes of more solid materials; that when a vessel puts to sea, and without any other assignable cause, immediately proves to be dangerously leaky, the presumption is that she is unseaworthy; that this might happen from a latent defect, not discoverable, even upon a careful examination, before lading her; and if such latent defect actually existed she would not be seaworthy; that from the testimony of the master, if believed, the vessel in this instance, did not immediately after her departure begin to leak badly, nor until bad weather had occurred; and they must determine whether it was reasonable for them to believe that the leak arose from want of seaworthiness, or from causes insured against. That when the captain determined to seek a port at which to refit, it was not, if he may be believed, because he thought it indispensable that he should do so, but because the crew refused to work at the pumps any longer unless he would do so; that in such case he was bound to seek a port the least out of the course of his voyage, and most convenient for the purpose, which could

reasonably be expected to be reached with safety; that he was not bound to turn off directly at a right angle with the course of the intended voyage, to seek a port, though convenient for the purpose of refitting, which at the time might happen to be geographically the nearest; that in case of accident or disaster the master was agent for all concerned, and bound in good faith, and without any sinister purposes of his own, to conduct as his judgment would dictate to be most for the interest of all concerned; and if it should appear, that he had so conducted, and can be believed to have been a master suitable for the voyage, if a loss nevertheless occurred, the defendants would not be exonerated from their liability by reason of his not having instantly, upon finding himself under the necessity of making a port to refit, steered for the port at that time geographically the nearest; and that after he had determined to make for one port and had steered therefor, if he found it would be more judicious for him to attempt to make a different port, he was justifiable in attempting to make such other port.

If these instructions were materially incorrect, the verdict for the plaintiff was to be set aside; otherwise judgment was to be rendered thereupon, unless a new trial should be granted for the cause set forth in the motion of the defendants.

*Deblois,* for the defendants, argued in support of the following, among other legal positions.

When from necessity the master of a vessel in distress, for the safety of the vessel, deviates from his course, it is his duty to make the nearest convenient port, where the vessel can be repaired, without regard to the fact, that there is a port where she could be more conveniently repaired, although this last mentioned port is not so great a deviation from her course to the port of her original destination, if said port is at a greater distance than the port to which she might run and obtain repairs. Or in other words. The interest of the owner or his convenience, are not to be made paramount to the interest of the underwriters.

By pursuing a different course, a deviation is committed, just as such deviation would be committed by quitting the course of the voyage without being in distress.

When the original voyage was broken up from necessity, the law substituted a new voyage, the point of departure being the place where he bore up for a port of safety, and that port of safety being the other *terminus*, and the voyage the most direct practicable course between them, and should be followed directly and strictly. The vessel was rendered unseaworthy, and should have been restored to seaworthiness, as soon as practicable. 1 Phil. on Ins. 193; *Motteaux v. London Ins. Co.* 1 Atk. 556, reported in 1 Marshall on Ins. 410, (Condy's Ed. 344); *Clark v. U. F. & M. Ins. Co.* 7 Mass. R. 365; *Guibert v. Redshaw,* cited in Marsh. on Ins. 411, and in Park on Ins. 301; 1 Marshall, 413; *Neilson v. Columb. Ins. Co.* 3 Caines, 108; *Lavabre v. Wilson,* 1 Dougl. 284; 1 Phil. Ins. (2d Ed.) 537. That it is more for the interest of the owners, or nearer to the direct course of the original voyage, furnishes no excuse for not making the vessel seaworthy at the nearest practicable port. When it is said the master may exercise a discretion, it is intended, that such discretion should be exercised as to the necessity of deviating; but when he has determined to deviate, he must follow the substituted voyage directly and expeditiously. *Kettell v. Wiggin,* 13 Mass. R. 72; *Robertson v. Col. Ins. Co.* 8 Johns. R. 491; *Maryland Ins. Co. v. Le Roy,* 7 Cranch, 26; *Phelps v. Auldjo,* 2 Campb. 350; Marshall, 522; 1 Phil. Ins. 514, 516.

If it be true that deviating from the original voyage, occasioned by distress, substitutes a new voyage, as we contend it is, then this new voyage is subject to the same restrictions as the original voyage — the law is, that nothing will justify a deviation but a real and imperious necessity. *Stocker v. Harris,* 3 Mass. R. 409; *Kettell v. Wiggin,* 13 Mass. R. 68; *Brazier v. Clapp,* 5 Mass. R. 1; Curtis' Treatise on Maritime Law, 236.

*W. P. Fessenden* and *W. Goodenow,* for the plaintiff, con-

tended that the law does not require, that the master of a vessel, when he makes a deviation from the purposed voyage from necessity, shall be obliged to make for the nearest port, geographically.

Nor is he bound to determine, when he first makes the deviation, the particular port he will enter. He should and indeed must take into consideration the wind, the fog, and the various other considerations, which would render one port preferable to another, and often must alter his course.

Nor is he required, if he has once fixed upon a port to repair, to persevere at all hazards in attempting to enter it. He might find it inconvenient or dangerous to do so; and it would be misconduct in him to risk his vessel and the lives of those on board in making such attempt, when by changing his course, all might be saved.

The master of the vessel is bound to act for the good of all concerned, according to his best skill and judgment, and not for the benefit of the underwriters only, if he knows the vessel to be insured. He is bound to determine what course to pursue on board his vessel and in time of danger; and if he honestly and fairly decides the matter, as his judgment directs, he is justified in so doing, and the insurers cannot escape from their contract.

They controverted the other positions of the counsel for the defendants; and cited Park on Ins. 294; Marsh. on Ins. 408; 1 Phil. on Ins. (2d Ed.) 516, 520; 11 Johns. R. 352; 2 Strange, 1264; Cowp. 601; 7 Mass. R. 349 and 368.

*S. Fessenden,* for the defendants, replied.

The opinion of the Court was drawn up by

SHEPLEY J. — This suit is upon a policy of insurance on the freight of goods composing the cargo of the barque Isadore during a voyage from Havana to St. Petersburg, with liberty to go to Matanzas to complete her lading. The vessel appears to have sailed from Matanzas on July 6, 1844, and to have been lost with her cargo on Trundy's reef, near Portland, on the morning of the second day of August following. It was

contended in defence, that the vessel was not seaworthy; and that she deviated from the course of the voyage. The jury having found under proper instructions, that she was seaworthy, that point of the defence is not now presented for consideration. A motion has been made to have a verdict for the plaintiff set aside on the ground, that the testimony does not show sufficient cause for the admitted deviation. It is also insisted, that the instructions did not state the law correctly, respecting the duties of the master in relation to it.

The motion to set aside the verdict on the alleged defect of proof will be first considered. It appears from the testimony of the master, that the vessel after leaving her port met with rough weather and a heavy, short sea. That she soon leaked so much as to require at times three thousand strokes of a pump in an hour to keep her free; that on the morning of the eighteenth of July the crew made a representation to him, that they were exhausted by their labors at the pumps, and that they requested him to make a port. He states, that it was perhaps safe to have kept on their course, and that he should have kept on his course had it not been for the crew's coming aft, as they did, and refusing to pump. That during that day he altered his course with the intention of going into Boston bay to make a port. He then supposed his vessel to be in latitude 34° 13', and longitude 68½, and to be three or four hundred miles from the Chesapeake bay, and about the like distance from the Delaware. The wind, as he states, was fair for Norfolk, and that was a convenient port for making repairs. That he made Gay-head, on July 29, was within fourteen miles of Cape Cod on July 31, and he might have run into Boston, but the weather was coming on thick and hazy, and he was afraid to, as a southeast wind drives the fog into the bay. That he was twenty or thirty miles nearer to Boston than to Portland. That he thought Portland the most safe and convenient port, and much easier to enter. That in going into Boston he must lay by for a pilot; that he was a sufficient pilot to take the vessel into Portland; that he knew more about the port, than he did about the port of Boston; that he considered the

difference in distance between Boston and Portland more than compensated by his better knowledge of Portland harbor; and that it was as easy to make Portland as any other harbor, after he made the land. The defendants introduced the log-book and the testimony of a couple of masters of vessels. Their testimony does not greatly differ from that of the master in any essential particular.

The counsel contend, that the master should have made the port of Norfolk, and omitting that, the port of New York, or of Newport, or of Boston, as he had opportunity. They have caused a calculation to be made from the log-book by taking the bearing and distance of the vessel from great Bahama isle on July 10, and from Gay-head light, on July 29, to exhibit her position on the ocean during several intervening days, and thereby to show, that on different days she was much nearer to some one of those ports than the master stated her to be. And it is said, that the winds appear by the log-book to have been fair for her to enter them. By that calculation she would appear to have been within 173 miles of Norfolk on July 19 ; within 39 miles of Sandy Hook on July 25 ; and within 18 miles of Newport on July 29.

It is insisted, that the master had no right to neglect or refuse to enter either one of them for the purpose of attempting to reach a port in Boston bay or the port of Portland. When the question for consideration is, whether the verdict of the jury was unauthorized by the testimony, the Court must judge of their conduct from the testimony presented for their consideration, and not from calculations, however correct, which were not presented in the testimony, and which they could not be expected to make. To enable a person to make such calculations he must be informed of the latitude and longitude of the several ports and points of land, and the results would still be subject to the uncertainty occasioned by currents in the ocean. Masters or pilots, having a knowledge of these, might be enabled to state the vessel's place on different days with a sufficient degree of accuracy for practical purposes by an inspection of the-log book. But the Court would not be

authorized to consider, that jurors had been negligent of duty, should they make no attempt to ascertain it. Especially in this case, when it appeared from the testimony of one of the masters introduced by the defendants, " that a ship's place could not be accurately ascertained by the log-book ;" and from the testimony of both of them, that a master on the deck of his vessel could judge better than any other person, of the propriety of attempting to make a particular port. The Court is not authorized to set aside this verdict for any neglect of duty or misconduct of the jury.

With respect to the law applicable to the case the counsel insist, that the vessel should have proceeded to the nearest port, where she could have been conveniently repaired, in preference to one more distant and more nearly in her course and more convenient for making the necessary repairs; and that the jury should have been so instructed. They contend, that as soon as a vessel becomes unseaworthy, it is the duty of the owner to make her seaworthy with the least possible delay ; that his interest to pursue the voyage as nearly as may be, and to find the most convenient port to repair, is not to be preferred to his duty to keep his vessel seaworthy. If this should be admitted, it could not be decisive in this case, as the testimony does not fully prove, that the vessel was in so dangerous a condition, as to make it necessary, that she should seek a port for repair, the master stating that he should have kept on his course, if the crew had continued their labors. If the vessel was not in such peril as to require an immediate departure from the course of the voyage, it could not have been justified, if the crew had not insisted upon it. If the master from prudential considerations should in such case defer to their judgment, influenced perhaps by their fears or desire of ease, he should yield no further, than the circumstances, in which he was placed, seemed to require ; and should depart from the course of his voyage as little, as he could and secure their performance of duty ; and provide for any anticipated danger.

But it cannot be admitted, that the law is correctly stated in those propositions. The primary purpose of the owner of the

vessel and of the cargo, and of others interested, is to have the voyage completed without unnecessary delay. This is known to the insurer, when he takes the risk. If the vessel suffer injury during the voyage, that risk may be increased by her weakness, or loss of rigging, or of sails, occasioned by stress of weather; and yet that injury may not be so great, that the master would be justified in departing from the course of the voyage for repair. The insurer cannot insist, that the voyage shall be delayed or varied, that the increased risk may not be continued, or that it may terminate as soon as possible. Upon the same principle, if the vessel have suffered such damage, that she cannot safely proceed to her port of discharge without repair, yet so long as she may be expected by an intelligent and faithful master to pursue her voyage in safety, she will be entitled to do so. The interest of the insurer is not, therefore, the controlling consideration, that should influence a master to depart from the course of his voyage. That consideration is the safety of life. Next to that is the preservation of the property entrusted to his care; and the pursuit and accomplishment of the voyage can be forsaken or delayed only so far as it may become necessary for the security of life and property. When this requires an instant and entire departure from that course, the duty of the master is determined, and he must seek the nearest land, which he can hope to reach, if the peril be so great as to outweigh all other considerations. When the vessel cannot safely pursue her course to its termination, and the danger is not imminent, her departure from it should be as little, and her delay as short, as it reasonably can be, for the purpose of making such repairs as may enable her to complete the voyage in safety. To determine what port to seek for repair, the master should consider the extent of the danger, its position as near to or more distant from the course of the voyage, and the facility and speed with which the necessary machinery, materials and labor can be procured and applied to the vessel's use. The master in most cases must necessarily be the principal judge of the degree of peril, to which his vessel is exposed, and of her ability to proceed with safety to

a nearer or to a more distant port, and of the facilities for repairing her at different ports. If he be competent and faithful, his decisions respecting these matters, made in good faith, should be satisfactory to all interested, although he should err in judgment. The position stated by Marshall, c. 12, § 2, has been in substance affirmed by cases decided in this country. *Wiggin* v. *Amory*, 13 Mass. R. 123 ; *Graham* v. *Commercial Ins. Co.* 8 Johns. R. 352. Marshall states, that one general principle pervades all the cases; that if the master in departing from the usual course of the voyage from necessity, acts *bona fide* and according to his best judgment, and has no other view but to conduct the ship by the safest and shortest course to her port of destination, what he does, is within the spirit of the contract, and the voyage will still be protected by it. In the case of *Lavabre* v. *Wilson*, Doug. 284, Lord Mansfield stated, that a deviation from necessity must be justified both as to substance and manner. Nothing more must be done than necessity requires. This would not authorize a master, who judged, that he was in no imminent peril, to depart entirely from the course of the voyage to seek the nearest port, where he could conveniently refit. In the case of the *Maryland Ins. Co.* v. *Le Roy*, 7 Cranch, 30, the opinion states, that a deviation must be strictly commensurate with the *vis major* producing it. Probably the idea intended to be conveyed was, that the deviation must be as great and no greater than the impending danger required.

It is further contended, that if the master could be permitted to depart from the course of the voyage for a port in Boston bay, that he should have strictly adhered to his newly adopted course and voyage, and should not have departed again to seek the port of Portland. There can be no doubt that it was his duty to pursue that new course without delay or deviation, unless prevented by some unforeseen obstacle. Such he alleges, that he found in the state of the weather, by which the fog was carried into that bay to such extent as to render it dangerous to attempt to enter a port there. In his conclusion, that it was better under the circumstances stated by him to

attempt to reach Portland, rather than Boston harbor, he appears to have been justified by the testimony of the masters introduced by the defendants. One of them states, that "if the weather was thick he would keep off and keep out rather than make for Boston bay. That Massachusetts bay is worse than Casco bay in thick weather." There is no testimony in the case tending to prove that he did not act in good faith in the selection of Portland harbor as the one which he might hope to reach with the least danger. There is no rule of law, which would control him so absolutely as to prevent his acting as he judged to be best for the preservation of the lives and the property entrusted to his care. It will be perceived, that the principles before stated would fully authorize the instructions, which were given, and there must be judgment on the verdict.